

SO ORDERED.

SIGNED this 8th day of September, 2015.

_Dale L. Somers_
Dale L. Somers
United States Bankruptcy Judge

Designated for publication

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In Re:

**BROOKE CORPORATION, et al.,**

              **DEBTORS.**

**CHRISTOPHER J. REDMOND, Chapter 7 Trustee of Brooke Corporation, Brooke Capital Corporation, and Brooke Investments, Inc.,**

              **PLAINTIFF,**

**v.**

**CJD & ASSOCIATES, LLC, a/k/a Davidson-Babcock,**

              **DEFENDANT.**

**CASE NO. 08-22786
(jointly administered)
CHAPTER 7**

**ADV. NO. 11-6236**

## MEMORANDUM OPINION AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT,
## GRANTING CJD'S MOTION AND DENYING THE TRUSTEE'S MOTION

In this adversary proceeding, Christopher J. Redmond, the Chapter 7 Trustee of Debtors Brooke Corporation (Brooke Corp), Brooke Capital Corporation (Brooke Capital), and Brooke Investments, Inc., seeks to avoid certain transfers from Brooke Corp to Defendant CJD & Associates, LLC (CJD), under 11 U.S.C. § 547, to recover the avoided transfers from CJD under 11 U.S.C. § 550,[1] and to obtain an award of prejudgment interest. The Trustee appears by John J. Cruciani and Michael D. Fielding of Husch Blackwell LLP. CJD appears by Paul D. Sinclair and Brendan L. McPherson of Polsinelli PC. The parties have stipulated that the Court has jurisdiction under 28 U.S.C. §§ 157 and 1334, that this is a core proceeding, and that venue is proper.[2]

The parties have filed and responded to cross-motions for summary judgment. Oral argument on the motions was held on May 7, 2015. The Court finds that there are no material facts in controversy, finds that certain transfers from Brooke Corp to CJD were preferential under § 547(b), grants in part CJD's contemporaneous-exchange-for-new-value defense under § 547(c)(1), and grants in part CJD's ordinary-course-of-business defense under § 547(c)(2). After applying the subsequent-new-value defense under § 547(c)(4) to the remaining preferential transfers, the Court finds that CJD has no liability to Brooke Corp's bankruptcy estate and therefore grants judgment in favor of CJD.

**UNCONTROVERTED FACTS.**

---

[1] Future references to sections of title 11 in the text shall be to the section number only.

[2] Doc. 103 at ¶¶ 5, 6, and 7.

Case 11-06236    Doc# 133    Filed 09/08/15    Page 2 of 44

The parties have stipulated to the facts in the Parties' Amended First Set of Stipulations.[3]  The parties' motions for summary judgment also rely upon additional facts, most of which are not controverted.  The Court has considered these cited materials and has also considered the complete testimony of several people whose depositions were filed as exhibits to the summary judgment pleadings.[4]

## A.  STIPULATED FACTS.

At all relevant times, CJD was a Kansas limited liability company that did business under the trade name of Davidson-Babcock.  CJD was a wholly-owned subsidiary of Brooke Brokerage Corporation.  Brooke Brokerage was a wholly-owned subsidiary of Brooke Corp.  Brooke Corp was insolvent at all relevant times.  Brooke Corp filed for bankruptcy relief on October 28, 2008.  CJD was administratively dissolved effective July 15, 2010, for failure to file its annual report with the Kansas Secretary of State.

CJD was a professional wholesale general insurance agency which specialized in excess and surplus lines of insurance coverage for commercial risks.  CJD wrote approximately $15 million of premium per year and operated in approximately 8 states in the Midwest.  CJD also wrote business for Brooke agents in approximately 29 states, and this business represented approximately 30% of CJD's premium.

On January 24, 2007, Cliff Daniels was elected to the Board of Directors of CJD

---

[3] Doc. 103.

[4] *See* Fed. R. Civ. P.  56(c)(3), made applicable by Fed. R. Bankr. P. 7056 (in deciding summary judgment motion, court needs to consider cited materials but may consider other materials in record).

and to the offices of Senior Vice President and Assistant Secretary.  On May 15, 2007, the CJD board of directors by written consent authorized William Greet, Anita Lowry, and Kristy Lenker to take actions concerning CJD's depository bank accounts, including transferring and withdrawing funds.  Greet was an officer of CJD, but Lowry and Lenker were employees of Brooke Corp or Brooke Capital, or both, and not officers or employees of CJD.

CJD conducted its business using at least three bank accounts.  At all relevant times, it had:  (1) an operating account at First National Bank of Phillipsburg, Kansas (FNB), and later at GenBank (also in Phillipsburg); (2) a company payable account through which it passed monies it received to various insurance carriers (at FNB and later GenBank); and (3) an account at First National Bank in Overland Park.  So long as Brooke Corp made funds available, CJD had the ability to withdraw money from and deposit money into its operating and payable accounts.  Brooke Corp also had an operating account at FNB and later GenBank, as well as various other accounts at FNB and GenBank.  For each account, the company owning the account had title to the funds on deposit at any given time.  The Brooke companies could use software to transfer funds between accounts held by the Brooke companies at GenBank, including CJD.

Exhibit A to the Stipulations is a 65-page spreadsheet of transactions from October 30, 2006, through October 24, 2008, that were initiated by Brooke Corp and transferred funds back and forth between CJD accounts (at FNB and later, GenBank) and Brooke Corp accounts (at FNB and later, GenBank).  These are referred to as "account-to-account

4

transfers." Brooke Corp made 380 such transfers to CJD during the one-year preference period.[5] None of these transfers related to insurance coverage for insureds.

CJD monthly balance sheets for the period between October 31, 2007, and September 7, 2008, listed a "Parent Company Payable" that Brooke Corp owed to CJD on the date of each balance sheet. The amount of the Parent Company Payable varied from a high of $3,708,797 on October 31, 2007, to a low of $2,020,361.76 on May 31, 2008.

## B. ADDITIONAL UNCONTROVERTED FACTS.

Approximately three or four years before its bankruptcy filing, Brooke Corp started a practice of moving funds from one subsidiary through Brooke Corp to another subsidiary. Brooke Corp made this change so it could implement a mechanism to "track the different subsidiaries and how much one owed to the other."[6] Prior to the change, funds would not flow through Brooke Corp, but directly between subsidiaries that needed cash, and the subsidiaries would share cash.

The system used after the change was called the "Cash Management System." It was conducted by Brooke Corp's cash management team, which was headed by Anita Lowry and comprised of approximately 20 people.[7] It was a key function of Brooke Corp's cash management team to see, on a daily basis, that if a particular Brooke Corp subsidiary was short of cash and was going to overdraw an account, funds would be

---

[5] The parties agree that CJD was an insider for purposes of § 547(b)(4).

[6] Testimony of Anita Lowry at 21:21-22.

[7] *Id.* at 14:9-12.

5

transferred from a subsidiary with cash, through Brooke Corp, to the subsidiary that needed cash.  Leland Orr, Chief Financial Officer of Brooke Corp, described the system as follows:  "The cash management was, essentially, all the funds from all of the entities came in.  They would make transfers.  If a specific account needed cash for the night, they would deposit money in that specific account overnight.  And then the next morning, they bring that cash back into the account that it was taken from."[8]

CJD was particularly targeted as a source of cash for other Brooke subsidiaries because it "had more funds than any other particular subsidiary."[9]  It had cash on hand because customers would pay premiums to CJD, and CJD would have a certain amount of time before it was required to pay those premiums to the insurance carriers.  CJD's Overland Park account existed as a "collections account" into which CJD deposited funds.  Those funds were swept by Brooke Corp cash management team members to one or more of CJD's Phillipsburg accounts.  CJD did not effectuate or control the sweeps.  In at least the two years prior to Debtors' bankruptcy filings, on a nearly daily basis, Brooke Corp's cash management team would initiate an account-to-account transfer — a transfer out of one or more of CJD's Phillipsburg accounts to one or more Brooke Corp accounts.  Generally, the next business day, Brooke's cash management team would "reverse" or "put back" the identical amount of funds into CJD's Phillipsburg accounts from one or more of Brooke Corp's accounts.  CJD refers to these transfers as Cash Management

---

[8] Testimony of Leland Orr at 59:9-18.

[9] Doc. 115 at 8, ¶ 22, quoting testimony of Anita Lowry at 22:8-21.

Transfers. For the one-year period prior to Brooke Corp's bankruptcy, there were 272 transfers followed by reversals of the identical amount. Four of the reversals were made the same day, 252 were made the next day, 13 were made two days later, and three were made three days later.[10] This pattern of replacing funds Brooke Corp withdrew from CJD's accounts was similar to the activity in the year preceding the preference period, when there were 365 Cash Management Transfers.[11] Nothing about Brooke Corp's practice and procedure related to Cash Management Transfers changed during the two-year period prior to Debtors' bankruptcies, and CJD did nothing during that period to solicit, pressure, or coerce Brooke Corp into making any transfers back to CJD.

There were no loan documents relating to the account-to-account transfers, and CJD never received any interest, fees, or other consideration related to the transfers from CJD to Brooke Corp. The account-to-account transfers were reflected in the Parent Company Payable item on CJD's balance sheets, which had a balance of $3,031,662.87 on September 30, 2008. During the one-year preference period, October 28, 2007, to October 28, 2008, $423,623,789.26 was transferred from CJD to Brooke Corp, and during the same period $421,802,455.30 was transferred from Brooke Corp to CJD. A balance sheet for CJD as of October 31, 2008, shows a Parent Company Payable of $5,119,447.50 owed by Brooke Corp to CJD.

Brooke Corp never sought permission from CJD for CJD to be part of the Cash

---

[10] Expert Opinion Report prepared by Steve W. Brown, doc. 115-15 at 7.

[11] *Id*. at 6.

7

Management System, CJD never gave its consent for Brooke Corp to make the transfers, and no one from Brooke Corp ever consulted with CJD and asked if it was an acceptable practice from CJD's vantage. Cliff Daniels of CJD testified that he knew of the account-to-account transfers, but that he never directed anyone to make any of the transfers. He did not request that they be discontinued "because that was the way it had always been done. And it wasn't of concern, you know, as long as moneys were always there to pay the accounts."[12] But in July or August 2008, when CJD began having zero balances in its accounts, its checks were bouncing, and CJD was being charged overdraft fees by GenBank, the practice became a concern to Daniels because suddenly CJD did not have money.[13] In August or September 2008, when the Brooke entities were experiencing financial difficulties and people were being let go, Daniels inquired whether there was any chance of CJD getting its own bank accounts, but the idea was rejected.[14] Before that, because the transfers were so routine and had occurred for such a long period of time, Daniels did not think about the practice.[15] With respect to the $1,990,000 transfer that Brooke Corp made to CJD on September 17, 2008, Daniels testified he had no knowledge of that transfer when it was made.[16] Patricia Huber, an employee of CJD who

---

[12] Testimony of D. Clifford Daniels at 100:10-12.

[13] *Id*. at 98:14-100:16.

[14] *Id*. at 130:16-23.

[15] *Id*. at 131:14-20.

[16] *Id*. at 114:18-20.

8

performed bookkeeping functions, testified that when she asked Brooke Corp how to account for the transfers, she was informed that they would be out one day and back in the next day.[17] Anita Lowry testified that she had no verbal communications with CJD about the account-to-account transfers, but that an accounting was sent to CJD on a daily basis.[18]

However, some of the transfers out of CJD's accounts appear not to have been a part of Brooke Corp's Cash Management System, as it was described by Leland Orr, Cliff Daniels, and Patricia Huber. These other transfers do not fit the pattern of a transfer from CJD to Brooke Corp followed by a redeposit by Brooke Corp within a day or two. Rather, they were transfers from and to CJD in various amounts without a related transaction. Other than the inclusion in the list of transfers attached to the stipulation of facts, there is very little evidence about these transfers. Anita Lowry testified that these transfers had nothing to do with getting money to Brooke Corp so it could get money to subsidiaries. As to a Brooke Corp withdrawal of $150,000 from CJD's account on November 1, 2006, before the preference period, she testified that notes relating to the transfer indicated it was related to a shared services agreement between Brooke Corp and CJD,[19] but there is no evidence that such an agreement existed. Three transfers the next

---

[17] Testimony of Patricia Huber at 140:8-16.

[18] Testimony of Anita Lowry at 94:8-24.

[19] *Id*. at 42:1-22.

9

day indicated they were related to payroll.[20] As to an $85,000 transfer from CJD on November 2, 2006, she testified that she did "not know why there would be a deposit without a corresponding withdrawal."[21] There is no evidence about the purpose of these transfers, which were made during the year before the start of the one-year preference period.

The Trustee's predecessor commenced this adversary proceeding against CJD in October 2011, and the Trustee filed an Amended Complaint on February 9, 2012. The Trustee sought to recover from CJD under §§ 544, 547, 548, 550, and 551. An attachment to the Amended Complaint set forth $6,447,653.46 in potential preferential transfers. In the joint stipulations, the Trustee formally abandoned Brooke Corp's claims under §§ 548 and 550. In his motion for summary judgment, the Trustee alleged that $2,048,127.40, composed of five transfers from Brooke Corp to CJD between September 17, 2008, and October 24, 2008, were avoidable preferences, and, after application of the subsequent-new-value defense, the net avoidable preference was $1,169,231.62.[22] During the same period, the amount of the Parent Company Payable was a high of $4,368,625.38 after the first transfer on September 17, 2008, a low of $2,378,625.38 after the second

---

[20] *Id*. at 43:8-44:7.

[21] *Id*. at 44:18-45:1.

[22] *See* Attachment A, Trustee's Preference Claim Minus Subsequent New Value. The parties' calculations for the period from September 17, 2008, to October 24, 2008, of the alleged preferential transfers Brooke Corp made to CJD minus the subsequent new value CJD paid to Brooke Corp are identical. *Compare* Doc. 117 at 25 *with* Doc. 115-13 at 28.

10

transfer on the same date, and $3,199,393.76 on October 24, 2008.[23]

## POSITIONS OF THE PARTIES.

The Trustee requests that the Court grant his motion for summary judgment and enter a judgment in favor of the Trustee against CJD as follows:[24]

> a. Finding that the $2,048,127,40 in transfers that Brooke Corp made to CJD between September 17, 2008 and September 29, 2008 are avoidable as preferential transfers pursuant to 11 U.S.C. § 547(b);[25]

> b. Finding that the contemporaneous exchange and ordinary course defenses under 11 U.S.C. § 547(c)(1) and (2) are unavailable to CJD;

> c. Finding that, after application of the subsequent new value defense under 11 U.S.C. § 547(c)(4), the net voidable preference is $1,169,231.62;

> d. Finding that the Trustee may recover $1,169,231.62 from CJD pursuant to 11 U.S.C. § 550; and

> e. Entering judgment against CJD in the amount of $1,169,231.62 plus prejudgment interest in the amount of

---

[23] *See* Doc. 117 at 24.

[24] The Trustee abandoned the constructively fraudulent conveyance claims against CJD under §§ 548 and 550 and Kansas law that were asserted in the Amended Complaint. The Trustee has also abandoned any preferential transfer claims that Brooke Capital may have against CJD.

[25] The preferential transfer amount is determined after application of the subsequent-new-value defense under § 547(c)(4) to all of the account-to-account transfers made by Brooke Corp during the preference period (the one-year period prior to Brooke Corp's bankruptcy filing on October 28, 2008). During the preference period, CJD transferred $423,623,789.26 to Brooke Corp and Brooke Corp transferred $421,802,45.30 to CJD. *See* doc. 115 at 4. During that time, because of the transfers CJD made to Brooke Corp after Brooke Corp had made transfers to CJD, the potential preference amount fell to zero several times, the last of which occurred on September 17, 2008, after CJD transferred $1,380,000 to Brooke Corp. Therefore, under § 547(c)(4), the subsequent-new-value defense, the Trustee cannot recover any transfers Brooke Corp made to CJD during the preceding portion of the preference period, even though there was an outstanding Parent Company Payable during that time. *See* Attachment A.

11

$357,819.78.[26]

CJD defends by contending that the Trustee has not established the elements of a preferential transfer under § 547(b) because the account-to-account transfers did not result in a debtor-creditor relationship with Brooke Corp, and if such a relationship was created, CJD has no liability because of the contemporaneous-exchange-for-new-value defense and the ordinary-course-of-business defense.

## DISCUSSION.[27]

### A. THE TRUSTEE HAS ESTABLISHED THE ELEMENTS OF AVOIDABLE PREFERENTIAL TRANSFERS, INCLUDING THAT CJD WAS A CREDITOR OF BROOKE CORP WHEN BROOKE CORP MADE THE TRANSFERS WHICH THE TRUSTEE SEEKS TO AVOID.

The Trustee has the burden to establish the elements of his § 547(b) case. The parties have stipulated to the existence of the elements under § 547(b)(2) (that the transfers were for or on account of an antecedent debt owed by Brooke Corp before the transfers were made),[28] § 547(b)(3) (that the transfers were made while Brooke Corp was insolvent), and § 547(b)(5) (that the transfers allowed CJD to receive more than CJD

---

[26] Doc. 117 at 20-21.

[27] The bankruptcy of an entity who was a party to a prepetition cash management system can present multiple difficult issues under the Bankruptcy Code. *See e.g., Amdura Nat'l Dist. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447 (10th Cir. 1996); *LandAmerica Financial Group, Inc. v. Southern Cal. Edison Co.*, 525 B.R. 308 (E.D. Va. 2015).

[28] The Court understands this stipulation to be conditional — if a debt was created by the transfers from CJD to Brooke Corp, then the transfers from Brooke Corp to CJD satisfied an antecedent debt. Although the Trustee suggests that the stipulation bars CJD's defense that no debtor-creditor relationship existed, the Court does not construe that stipulation so broadly as to preclude CJD's only defense to the elements of the Trustee's claim under § 547(b).

12

would receive if the case were under Chapter 7, the transfers had not been made, and CJD received the payments allowed by the Bankruptcy Code). The Trustee therefore must prove only that (1) the transfers were of "an interest of the debtor in property" (§ 547(b)); (2) the transfers were "to or for the benefit of a creditor" (§ 547(b)(1)); and (3) the transfers were made within the preference period defined by § 547(b)(4).

The Trustee argues that the first remaining element, that the transfers were of "an interest of the debtor in property," is satisfied. The transfers were made from Brooke Corp's account at GenBank. The parties stipulated that Brooke Corp was the owner of the account and that the money transferred from the account was the property of Brooke Corp at the time each transfer was made. The Trustee further argues that the Tenth Circuit has adopted the "dominion/control" test for determining "whether a transfer of property was a transfer of 'an interest of the debtor in property.'"[29] Under this test, the right to use an item or to control its use is a property interest, and the amount of time that the debtor controls that property interest is irrelevant, since even a fleeting moment of control is sufficient to satisfy the test. CJD does not challenge this position.

The Trustee contends that the second remaining element, that the transfers were "to or for the benefit of a creditor," is satisfied because when the transfers were made, CJD was a "creditor" as defined by the Bankruptcy Code. The Code defines a "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the

---

[29] *Parks v. FIA Card Services, N.A. (In re Marshall)*, 550 F.3d 1251, 1255-56 (10th Cir. 2008).

13

order for relief concerning the debtor."[30]  A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[31]  The parties have stipulated that the CJD balance sheets "accurately portray the amount of funds owed by Brooke Corporation to CJD as of the date of each respective Balance Sheet."[32]  That amount, the Parent Company Payable, was $3,020,507.00 as of August 31, 2008.  The Trustee attached an exhibit to his motion for summary judgment that starts with the August 31, 2008 balance of the Parent Company Payable and calculates the running balance owed by Brooke Corp after each transaction between Brooke Corp and CJD for the period from August 31, 2008, through October 24, 2008. The running balance never dropped below $998,625.48, and was $3,088,577.99 on September 29, 2008, the date of the last Brooke Corp transfer to CJD sought to be recovered by the Trustee.  In response, CJD contends it was not a creditor because consent is required to establish a debtor-creditor relationship and the uncontroverted facts do not show such consent.  This defense is rejected by the Court for the reasons discussed at length below.

The third remaining element is that the transfers were made within the preference period defined by § 547(b)(4), either 90 days prepetition or, for transfers to insiders, one

---

[30] 11 U.S.C. § 101(10)(A).

[31] 11 U.S.C. § 101(5)(A).

[32] Doc. 103 at 9, ¶ 108.

14

year prepetition.  The Trustee seeks to recover only transfers that were made after September 17, 2008, which is less than 90 days before the Brooke Corp voluntary bankruptcy petition was filed on October 28, 2008.  CJD does not dispute this element.

When challenging the second remaining element, CJD contends the Trustee has failed to establish the existence of a debtor-creditor relationship and thus cannot avoid the transfers under § 547(b).  It is CJD's position that a debtor-creditor relationship can only arise with the consent of both parties, and it is uncontroverted that CJD did not expressly consent to the transfers to and from Brooke Corp.  CJD asserts it "was not in a debtor-creditor relationship with Brooke Corporation; it was owned and dominated by Brooke Corporation, and now the Trustee attempts to take advantage of that domination by calling the Cash Management Transfers something akin to a short-term loan or payable obligation."[33]  The Trustee has not controverted CJD's statements that all of the transfers from Brooke Corp to CJD were initiated by Brooke Corp's cash management team, that CJD never expressly consented to or authorized the practice, and that no one at Brooke Corp asked if it was acceptable for Brooke Corp to use CJD's premium funds.  The issue is a question of law — is consent required to create a debtor-creditor relationship?

In support of the consent requirement, CJD relies upon several cases.  First, CJD quotes *AppOnline*, a New York bankruptcy court decision, which, without citing any supporting authority, states, "Any debtor-creditor relationship can only arise with the

---

[33] Doc. 115 at 20.

consent of both parties."[34]  In *AppOnline,* a Chapter 11 trustee brought a preference action against a bank, contending that overnight negative balances in the debtors' bank account ("Not Sufficient Funds" (NSF) positions created when the debtors did not have enough money in their account to satisfy checks presented for payment against the account), which were eliminated the next business day by transferring funds from another account in which deposits had been made and stopping payment on some of the checks that had caused the negative balances, created a debtor-creditor relationship between the bank and the debtor.  The court rejected this claim.  The NSF position was created automatically during the check clearing process.  Under banking law, including federal regulations and the UCC, whether that NSF position develops into an actual overdraft (an extension of credit by the bank to the drawer) or is resolved in another way depends upon what the drawer and the bank do in the period between the creation of the NSF position and the expiration of the bank's midnight deadline to honor or return the check or checks that created the NSF position.  If the customer covers the check or stops payment on it, or the bank bounces the check, there is no extension of credit and no debtor-creditor relationship between the customer and the bank is created.  A debtor-creditor relationship is established only if the bank agrees to cover the overdraft with a loan; this would be an action based upon the consent of the bank and the customer, as opposed to the automatic check-clearing procedures.

---

[34] *Jacobs v. State Bank (In re AppOnline.com, Inc.)*, 296 B.R. 602, 619 (Bankr. E.D.N.Y. 2003).

16

Concerning the need for consent to establish a debtor-creditor relationship, CJD also relies upon two additional banking cases. The first is *Laws*,[35] where, in accord with banking law, the court held that routine advances banks make on uncollected funds do not create a debt, but that a debt arises only if the bank and the customer agree to convert uncollected fund balances into a loan. The second is *Nordberg*,[36] where under the facts presented, the court held that a bank acted as a conduit when it received funds for deposit into a customer's account against which it had advanced money in reliance on its expected receipt of the funds.[37]

In response, the Trustee argues that the foregoing cases are wholly distinct from this case and therefore inapplicable. The Court agrees. The situation in this case is not analogous to the relationships that exist during the check collection process, which is governed by the well-established and detailed laws of banking transactions. The *AppOnline* statement regarding the need for consent, which was not supported by any authority, was fact specific. It described how a debtor-creditor relationship arises during the check clearing process. CJD points to no general principle that consent is required to

---

[35] *Laws v. United Missouri Bank of Kansas City, N.A.*, 98 F.3d 1047, 1050-51 (8th Cir. 1996).

[36] *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1200-01 (11th Cir. 1988).

[37] CJD also relies upon *Claybrook v. Consolidated Foods, Inc. (In re Bake-Line Group, LLC)*, 359 B.R. 566 (Bankr. D. Del. 2007), which arose outside the banking context. In that case, a check payable to a third party was misdelivered to the debtor who deposited it into its account, and then issued a check delivering the funds to the rightful owner. The court ruled the funds received by the debtor were held in constructive trust for the true owner, and there was no transfer of an interest of the debtor in property for purposes of § 547(b). The facts in this case are not similar.

17

form a debtor-creditor relationship. Rather, the Bankruptcy Code definitions of "claim," "debt," and "creditor" make no reference to consent.

As part of its argument that consent is required to create a debtor-creditor relationship, CJD argues that no creditors of Brooke Corporation are worse off because of the Cash Management Transfers. It is true that the Cash Management Transfers did not harm Brooke Corp's creditors — by definition these transfers were Brooke Corp's transfer of an amount identical to an amount recently taken from CJD. But the account-to-account transfers from Brooke Corp to CJD which were not Cash Management Transfers did deplete Brooke Corp's assets. CJD further argues that "during the Preference Period [the one year before filing], Brooke Corporation's cash management team took $1.8 million more in funds from CJD than it replaced,"[38] and according to CJD balance sheets, by October 31, 2008 (after the Brooke Corp bankruptcy was filed), Brooke had taken $5.1 million more from CJD than it had replaced. This argument seeks to apply the "net result" rule, a doctrine judicially created under the 1898 Bankruptcy Act.[39] Under that rule, "if there was a running account of credit and payment between debtor and creditor, all transactions over the preference period were examined. If more credits than payments occurred, even though individual payments during the period might

---

[38] Doc. 115 at 20.

[39] *McClendon v. Cal-Wood Door (In re Wadsworth Bldg. Components, Inc.)*, 711 F.2d 122, 123 (9th Cir. 1983).

18

comprise a preference, there was held to have been no preference."[40]  The Tenth Circuit

has rejected this rule, finding that "[t]he orderly, equitable, and predictable liquidation or

reorganization of the debtor's estate anticipated by the 1978 Code would be undermined

by this post-hoc analysis of the financial benefits of preferential payments to creditors."[41]

    CJD next contends that "a cash management device such as existed here can never

be the basis for a creditor-debtor relationship,"[42] since it is deemed to be a service.  CJD

cites no cases involving a cash management arrangement between a parent and a

subsidiary.  The primary authority cited for support is *Consolidated Pioneer Mortgage*,[43]

which, like the cases discussed above, concerned the relationship between a bank and its

customer.  CJD argues that "[i]ts cash was utilized (albeit without its consent) as more-or-

less overdraft protection,"[44] and that "the transfers at issue are merely cash management

services/provisional credit."[45]

    The Trustee responds by arguing that the cited cases are distinct from the present

case; that the undisputed facts show a debtor-creditor relationship arose from the

_____

[40] *Id.*

[41] *Elec. Metal Prods., Inc. v. Bittman (In re Elec. Metal Prods., Inc.)*, 916 F.2d 1502, 1507 (10th Cir. 1990).

[42] Doc. 115 at 21.

[43] *Pioneer Liquidating Corp. v. San Diego Trust & Savs. Bank (In re Consol. Pioneer Mortg. Entities)*, 166 F.3d 342, 1999 WL 23156 (9th Cir. 1999) (unpublished opinion citing *Laws*, 98 F.3d 1047, discussed above).

[44] Doc. 115 at 22.

[45] Doc. 120 at 12.

19

transfers, as evidenced by the Parent Company Payable on CJD's balance sheets; that even though there were no formal loan documents, this does not change the fact that a debt existed; and that individuals who were involved in the Cash Management System testified that Brooke Corp owed money to CJD. The Trustee further points out that CJD's central argument that consent is required to create a debtor-creditor relationship is simply wrong; that there are many situations giving rise to the relationship where one or both parties have not consented to the claim arising. Examples given are claims arising from conversion and from negligence or recklessness.[46] The Trustee's arguments are persuasive.

The Court finds that the Trustee should be granted summary judgment on his § 547(b) claim with respect to the transfers made by Brooke Corp between September 17, 2008, and October 24, 2008. The only defense asserted by CJD is that no debtor-creditor relationship was created because the parties did not give consent for the transfers to give rise to loans. Consent is not an element of the Bankruptcy Code definitions of "claim," "debt," and "creditor." Consent was relevant in the cases relied upon by CJD because of the unique circumstances of those cases. The Cash Management Transfers gave rise to a debt that was quickly satisfied by Brooke Corp's subsequent replacement of the funds transferred from CJD. There is no evidence to support any other interpretation of the resulting relationship. The transfers that were not Cash Management Transfers, the

---

[46] Doc. 118 at 18-19.

account-to-account transfers from CJD with no related transfer back from Brooke Corp, gave rise to longer-term debt, analogous to a debt arising from conversion. The parties stipulated that the CJD balance sheets reflected a Parent Company Payable accounting for the account-to-account transfers between Brooke Corp and CJD. The transfers Brooke Corp made to CJD which the Trustee seeks to avoid were made to a creditor, as required by § 547(b)(1).

### B. THE CONTEMPORANEOUS-EXCHANGE-FOR-NEW-VALUE DEFENSE IS APPLICABLE TO THE CASH MANAGEMENT TRANSFER THAT OCCURRED ON SEPTEMBER 17, 2008.

"[U]nder section 547(c)(1) a transfer that would otherwise be considered preferential is insulated from attack by the trustee if (1) the preference defendant extended new value to the debtor, (2) both the defendant and the debtor intended the new value and reciprocal transfer by the debtor to be contemporaneous and (3) the exchange was in fact contemporaneous."[47] The purpose of this exception to preferential transfers, "like that of the other section 547(c) exceptions, is to encourage creditors to continue to deal with troubled debtors without fear that they will have to disgorge payments received for value given."[48] The defendant has the burden of proof.[49]

CJD contends that the elements of § 547(c)(1) are satisfied as to the Cash

---

[47] 5 *Collier on Bankruptcy,* ¶ 547.04[1] at 547-41 to -42 (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 16th ed. 2015).

[48] *Id.* at 547-42.

[49] 11 U.S.C. § 547(g).

Management Transfers, those transfers from Brooke Corp to CJD which returned to CJD an amount identical to that which had been transferred to Brooke Corp a short time earlier, usually the previous business day. The Trustee seeks to avoid one Cash Management Transfer, a transfer by Brooke Corp to CJD of $1,990,000 on September 17, 2008, which "replaced" a like transfer from CJD to Brooke Corp the previous day.

For this Cash Management Transfer, it is uncontroverted that CJD transferred funds (new value) to Brooke Corp on September 16, 2008. To satisfy the intent element, CJD relies upon deposition testimony. As to the transfers being contemporaneous, the uncontroverted fact is that Brooke Corp transferred $1,990,000 to CJD one day after receiving the same amount from CJD.[50]

The Trustee argues that the contemporaneous-transfer defense fails because CJD has failed to prove that *both* parties intended the transfers to be contemporaneous. Although conceding that Brooke Corp intended the Cash Management Transfers to be essentially simultaneous transfers of the funds recently taken from CJD, the Trustee argues that CJD had no such intent, that at most CJD had general knowledge that transfers back and forth were taking place.

The controversy is whether under the uncontroverted facts, the requirement of § 547(c)(1)(A) that the Cash Management Transfer which the Trustee seeks to avoid was

---

[50] CJD also relies on the analysis of an expert, Steve W. Browne, showing that of the 544 Cash Management Transfers made during the preference period (272 transfers from CJD and 272 transfers from Brooke Corp), four of the related transfers occurred the same day, 252 within one day, 13 within two days, and three within three days.

"intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor" is satisfied. "Since parties rarely testify as to their intent, the courts look to the circumstances surrounding each situation" to determine if the parties had the requisite intent.[51] The mutual-intent requirement is an independent and necessary element for the contemporaneous-exchange defense. The fact that exchanges are contemporaneous is not a substitute for intent.[52]

CJD cites three cases in support of its understanding of the exception. The first is *In re Lease-A-Fleet*.[53] The preference claim against two companies referred to as Goodways related to "'circles of cash' in which the same or nearly the same amount of funds flowed from the Debtor to the Goodways, the Goodways to Robins, and from Robins back to the Debtor again in a period of a few days."[54] The court found that there were no preferential transfers of interests of the debtor in property, applying reasoning similar to that supporting the earmarking doctrine, and that if there were preferential transfers, the contemporaneous-exchange defense applied.[55] There was no analysis of the

---

[51] *Silverman Consulting, Inc. v. Canfor Wood Products Marketing (In re Payless Cashways, Inc.)*, 306 B.R. 243, 249 (8th Cir. BAP 2004).

[52] *See, e.g., Official Plan Committee v. Expeditors Intern'l of Washington, Inc. (In re Gateway Pacific Corp.)*, 153 F.3d 915, 918-19 (8th Cir. 1998) (creditor's alleged release of liens on receipt of payments for prior invoices not sufficient for contemporaneous-exchange defense because debtor did not know about liens and so could not have had required intent).

[53] *Morse Operations, Inc., v. Goodway Graphics of Va., Inc. (In re Lease-A-Fleet, Inc.)*, 155 B.R. 666 (Bankr. E.D. Pa. 1993).

[54] *Id*. at 672.

[55] *Id*. at 682.

intent requirement.  The second case is *Triple H Auto and Truck Sales*.[56]  In that case, the

debtor, a vehicle sales company, issued checks to creditors when deals were reached that

would bring funds to pay debts.  If it appeared that the creditors, especially floorplan

lenders, might deposit their check before the debtor received payment for the cars, a

relative of the owners of the company would advance funds to the debtor by check, and

the debtor would simultaneously provide the relative with a check for repayment, which

she would deposit, usually within a few days.  The debtor's owners and their relative

testified that they gave the checks to each other with an intent that the transfers would be

a mere exchange of money, not a loan.  The court held that the simultaneous-exchange

defense applied to the contention that the transfers by the debtor were preferential.  This

finding was based upon "the testimony of the parties regarding their intent, the facts

surrounding the transactions, and the case law on this issue."[57]  The third case is *Nolan*, a

bankruptcy court opinion where the intent of the debtors and the brother of one of them,

who extended a $14,000 "bridge" advance, was that the advance would be repaid within a

week when a mortgage refinancing was approved.[58]  After the refinancing was approved,

and within the preference period, the debtors repaid the $14,000.  The debtors' Chapter 7

trustee sought to recover the payment.  The court found the contemporaneous-exchange

---

[56] *Littleton v. Hinton (In re Triple H Auto and Truck Sales, Inc.)*, 2009 WL 348858 (Bankr. S. D. Ala. Feb. 2, 2009).

[57] *Id*. at *5.

[58] *Pogge v. Nolan (In re Nolan)*, 1997 WL 33479209 (Bankr. C.D. Ill. Oct. 15, 1997).

defense applied because the defendant brother and the debtors intended the loan to be repaid upon the refinancing.[59]

The Trustee cites numerous cases supporting the importance of the mutual intent element. The oldest is *National City Bank*,[60] a 1913 United States Supreme Court decision, which commentators agree is still good law.[61] It dealt with a bank's unsecured advance (a clearance loan made to stockbrokers) which was to be repaid the same day. After advancing $500,000, the bank became aware that the value of the stock to be purchased was falling, and demanded and received security for the loan. The stockbrokers filed bankruptcy later the same day. The bankruptcy trustee successfully recovered the pledged collateral. While the parties intended a short-term loan, they had never intended a contemporaneous exchange of the collateral. A respected commentator states this case stands for the proposition that "[t]he exception provides no protection to the repayment or belated transfer of security in a short-term, open-credit transaction."[62] "'Whether the parties at the outset intended the exchange to be contemporaneous is determinative.'"[63] Some cases under the Bankruptcy Code hold that an intention to create

---

[59] *Id*. at *2-*4.

[60] *National City Bank v. Hotchkiss*, 231 U.S. 50 (1913).

[61] See 4 William L. Norton, Jr., and William L. Norton III, *Norton Bankruptcy Law & Practice 3d*, § 66:35 at 66-157 (Thomson Reuters 2014); 5 *Collier on Bankruptcy*, ¶ 547.04[1][a].

[62] 4 *Norton Bankr. L. & Practice 3d*, § 66:35 at 66-157.

[63] *In re Prescott*, 805 F.2d 719, 728 (7th Cir. 1986) (*quoting* 4 *Collier on Bankruptcy*, ¶ 547.37 at 547-124).

25

a short-term commercial loan is fatal to the defense.[64]  The Trustee also asserts "[c]ourts

have found that facts indicating lack of simultaneous timing, lack of discussion, and lack

of knowledge to be sufficient to show that mutual intent did not exist between the

parties."[65]  The cases cited to support that statement include *Gateway Pacific*, a decision

of the Eighth Circuit Court of Appeals.[66]  In that case, Debtor Gateway was in the

business of selling imported tools.  Defendant Expeditors contracted to act as the debtor's

freight forwarder.  When the bankruptcy trustee sued Expeditors to recover as preferences

payments the debtor had made on past-due invoices, Expeditors relied on the

contemporaneous-exchange defense on the rationale that when it received each payment,

it had released a security interest in the goods sold that had been created by its practice of

holding new shipments until it was paid on prior invoices, general lien provisions in the

parties' credit agreement and invoices, and general principles of commercial law.  The

appellate court affirmed the lower court's rejection of the defense on the basis of the

testimony of the debtor's former president that he had never discussed any claimed

---

[64] *See Manchester v. First Bank & Trust Co. (In re Moses)*, 256 B.R. 641, 653 (10th Cir. BAP 2000) (execution of note with one-month maturity date and prepayment provisions disproved intent to make contemporaneous exchange); *Brown v. Kitchenmaster (In re Hertzler Halstead Hospital)*, 334 B.R. 276, 289  (Bankr. D. Kan. 2005) (Chief Judge Nugent) (mutual intent to create short-term commercial loan is fatal to  contemporaneous-exchange defense, noting contrary holding of *In re Lease-A-Fleet*, 155 B.R. 666 (Bankr. E.D. Pa. 1993)).

[65] Doc. 118 at 25.

[66] *Official Plan Committee v. Expeditors Intern'l of Washington, Inc.* (*In re Gateway Pacific Corp.*), 153 F.3d 915, 918-19 (8th Cir. 1998).  The Trustee also cites *Webster v. Scott & Reid Gen. Cont'ors, Inc. (In re NETtel Corp., Inc.)*, 458 B.R. 782, 800 (Bankr. D.C. 2011) for the same principle: there is no mutual intent to release a lien when one party is not aware of the purported lien.

26

security interest with Expeditors, reasoning that his lack of knowledge of the security interest showed the absence of any intent to create a contemporaneous exchange.[67]  The Trustee also cites *Silver*,[68] where the court held defendant Avnet received an avoidable preference when it collected its judgment from Silver, and denied the defendant's contemporaneous-exchange defense.  "Silver could not have intended a contemporaneous exchange by payment of a judgment in exchange for a release of a judgment lien when he did not know of the existence of the judgment lien.  One can not intend to make an exchange if he is unaware that he is receiving something."[69]

The Court finds that the mutual intent required for the contemporaneous-exchange defense is present as to Brooke Corp's transfer to CJD of $1,990,000 on September 17, 2008, which replaced the transfer from CJD of the same amount on September 16, 2008.  Although it is uncontroverted that "CJD never expressly consented or authorized the practice related to the Cash Management Transfers — no one from Brooke Corporation ever consulted with CJD and asked if this was an acceptable practice from CJD's vantage,"[70] the Court is convinced that by September 2008, CJD was fully aware of the practice and intended that if CJD's funds were transferred to Brooke, they should be immediately replaced.  For several years, CJD was given notice of the transfers through

---

[67] *Id*. at 918.

[68] *Silver v. Avnet, Inc. (In re Silver)*, 130 B.R. 329 (Bankr. D.N.M. 1991).

[69] *Id*. at 329.

[70] Doc. 115 at 11, ¶ 32.

27

accounting reports that were sent daily. As stated by Cliff Daniels, the practice "wasn't of concern . . . as long as moneys were always there to pay the accounts."[71] Having money in the CJD account required prompt replacement of the transferred funds — the operation of the Cash Management System in its customary manner. In August or September 2008, Daniels became aware that CJD was experiencing a lack of funds to pay its bills. He inquired whether there was any chance of CJD getting its own bank accounts, but the idea was rejected.[72] In other words, by the time of the transfer in issue, Daniels was aware of the practice, inquired whether it could be stopped, but acquiesced in its continuation. These circumstances convince the Court that Daniels intended that any CJD funds transferred to Brooke Corp should be replaced the next business day.

The Court therefore holds that with respect to the transfer of $1,990,000 by Brooke Corp to CJD on September 17, 2008, CJD has sustained its burden of proof under § 547(c)(1), the contemporaneous-exchange-for-new-value defense. The Trustee may not avoid Brooke Corp's transfer of $1,990,000 to CJD.

### C. THE ORDINARY-COURSE DEFENSE OF § 547(c)(2) APPLIES TO BROOKE CORP'S CASH MANAGEMENT TRANSFER OF $1,990,000 TO CJD, BUT NOT TO THE OTHER ACCOUNT-TO-ACCOUNT TRANSFERS WHICH THE TRUSTEE SEEKS TO AVOID.

CJD also relies upon the ordinary-course-of-business defense of § 547(c)(2). There are two elements to the defense: (1) the "transfer was in payment of a *debt*

---

[71] Testimony of D. Clifford Daniels at 100:10-12.

[72] *Id*. at 130:16-23.

incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;" and (2) the *transfer* was either (a) "made in the ordinary course of business or financial affairs of the debtor and the transferee" or (b) "made according to ordinary business terms."  CJD has the burden of proving the defense, which is narrowly construed.[73]  The Trustee does not challenge that CJD has proven element (2)(a).

CJD contends that element (1), the debt-incurred element, is also present, but the Trustee disagrees.  CJD contends the uncontroverted facts establish that Brooke Corp's debt to CJD was incurred in the routine operation of Debtor and CJD.  The Trustee responds that the debt element is not satisfied because the test is whether the transaction was a typical arms-length creation of debt on the open market, and that loans between insiders or closely-affiliated parties do not satisfy the requirement.  The dispute is about the legal standard — do the practices of the parties, even if unusual, satisfy the requirement if they are according to their ordinary practices?

Courts do not agree on the interpretation of the debt-incurred element of § 547(c)(2).  *Collier on Bankruptcy* describes the requirement that the debt be incurred in the ordinary course as follows:

> As compared with other areas of preference law, there is scant case law on the issue of whether a debt has been incurred in the ordinary course of business between the debtor and the transferee. . . .

---

[73] *Jubber v. SMC Elec. Prods., Inc. (In re C.W. Mining Co.)*, ___ F.3d ___, 2015 WL 4717709, *2 (10th Cir. Aug. 10, 2015); *Jobin v. McKay ( In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1339 (10th Cir. 1996).

29

The primary tension in the interpretation of subsection 547(c)(2)(A) is whether it requires that the debt at issue be normal with regard to *each* party's business operations generally or that such debt be considered ordinary based upon the specific transactional history between the debtor and the transferee. The better reasoned decisions hold that a debt will not be considered incurred in the ordinary course of business if creation of the debt is atypical, fraudulent or not consistent with an arms-length commercial transaction.

Yet there is a contrary line of cases holding that, to satisfy subsection 547(c)(2)(A), the transferee must show that the debt at issue was incurred in the ordinary course of business between the debtor and the transferee. These cases narrow their focus to look only at whether the transaction that generated the challenged transfer is consistent with other transactions between the debtor and the creditor, rather than looking at whether the transaction is consistent with the general business operations of both the debtor and the creditor. These courts believe that subparagraph (A) contemplates a subjective test: Were the debt and the transfer ordinary as between the debtor and the creditor? To be subjectively ordinary implies some consistency with other business transactions between the parties.[74]

CJD contends that the test for the debt being incurred in the ordinary course is completely subjective — if the debtor and the creditor made loans of the type in issue in the ordinary course of their financial affairs, the test is satisfied. The Trustee contends that the test is at least in part objective — the debt must be normal with regard to both the debtor's and the creditor's businesses or financial operations generally. One court describes the subjective test as asking "whether the debt incurred was ordinary *as between* the debtor and the defendant" and the objective test as looking to "whether the debt was incurred in

---

[74] 5 *Collier on Bankruptcy*, ¶ 547.04[2][a][i] at 547-49 to 547-50.

the ordinary course of each party's business, as viewed separate from their dealings with one another."[75]

The case law in the Tenth Circuit is ambiguous about whether the objective test or the subjective test governs the ordinary-course defense, and each party contends that its position is supported by applicable precedent. In 1989, the Tenth Circuit in *Fidelity* addressed "whether § 547(c)(2) . . . applies to a transfer unrelated to the payment of trade debt."[76] Debtor Fidelity had been in the business of making small, high-interest consumer loans, and it did this by regularly borrowing money through selling certificates to small investors and then lending the proceeds out at higher rates. Suit was brought to recover distributions made to small investors during the preference period. Prior to an amendment in 1984, § 547(c)(2) had applied only to the payment of a trade debt incurred within 45 days before the transfer. After reviewing the legislative history and case law, the Circuit held that the subsection as amended in 1984 was not limited to trade debt. It also affirmed the finding that Fidelity's long-term debt represented by the certificates sold to small investors "was a regular part of its daily business, much like a bank or savings and loan institution."[77] The Circuit rejected the contention that the lower court's ordinary-course finding was erroneous on the basis that the defense did not apply to

---

[75] *Fitzpatrick v. Central Commc'ns and Elecs., Inc. (In re Tenn. Valley Steel Corp.)*, 203 B.R. 949, 953-954 (Bankr. E.D. Tenn. 1996).

[76] *Fidelity Savs. & Inv. Co. v. New Hope Baptist*, 880 F.2d 1172, 1173 (10th Cir. 1989).

[77] *Id.* at 1177.

31

"transactions which, from their inception, were designed to work a fraud"[78] and that Fidelity had engaged in such activity. Although Fidelity's securities registration had been suspended by the state, the Tenth Circuit affirmed the lower court reasoning that Fidelity's funding of its loan operations through the selling of certificates was a legitimate form of capitalization, and that there was no evidence of a Ponzi scheme or other inherently fraudulent operations. "While the subsequent conduct of its business may have been deficient, these deficiencies were not so pervasive as to render the whole of Fidelity's operations outside of the ordinary course of business."[79]

In 1996, then-Bankruptcy Judge Robinson decided *Liberty Livestock*,[80] a preference action brought by Chapter 7 trustee Chris Redmond. The transfers sought to be avoided were made by debtor Liberty Livestock to Ellis Country Abstract & Title Company (ECA) during the preference period in repayment of undocumented loans from ECA. ECA and Liberty were under common ownership and management. On the trustee's motion for partial summary judgment, ECA asserted the ordinary-course defense. In response, the trustee argued "that the debt was not incurred in the ordinary course of Liberty and ECA because it was not ordinary for a cattle feed lot to obtain short term operating loans to cover cash flow needs; and not ordinary for an abstract and title

---

[78] *Id*. at 1178.

[79] *Id*.

[80] *Redmond v. Ellis County Abstract & Title Co. (In re Liberty Livestock Co.)*, 198 B.R. 365 (Bankr. D. Kan. 1996).

32

company to make such loans."[81]  The court found that evidence regarding similarly-situated debtors was "immaterial because § 547(c)(2)(A) requires that the Court determine whether the debt was incurred in the ordinary course of the business between this particular debtor and creditor.  It is a subjective test.  Even if the creditor is not a traditional lender, if the transaction was ordinary as between this particular debtor and creditor, then it was in the ordinary course of their business."[82]  *Fidelity*, discussed above, was cited for support.  But although *Fidelity* focused upon the course of financial affairs between the debtor and its investors, it did not compare the subjective and objective tests under § 547(c)(2)(A), and did not expressly adopt a subjective test.

In 2006, Chief Judge Nugent of this District found "no doubt" that the debtor's checks written to an association of franchisees for past due insurance premiums for coverage through the association's insurance program with a full-service insurance broker were in payment of ordinary course debts under § 547(c)(2)(A).[83]  There was no discussion of the applicable test.

In 2013, in *C.W. Mining*,[84] a decision authored by Bankruptcy Judge Karlin, the Tenth Circuit BAP affirmed a grant of summary judgment applying the ordinary-course defense.  The debt in issue had been incurred in the debtor's purchase of a type of mining

---

[81] *Id*. at 373.

[82] *Id*.

[83] *Davis v. I.P.H.F.H.A., Inc. (In re Amarillo Mesquite Grill, Inc.)*, 355 B.R. 826, 833-34 (Bankr. D. Kan. 2006).

[84] *Rushton v. SMC Elec. Prod., Inc. (In re C.W. Mining Co.)*, 500 B.R. 635 (10th Cir. BAP 2013).

33

electrical system from SMC, with whom the debtor had no prior dealings. An invoice was issued for the full system, but rather than full payment being due on a specific date, progress payments were to be made as the system was manufactured, tested, and commissioned. C.W. Mining was involuntarily placed in bankruptcy just under 90 days after one of the payments, which the trustee sought to recover. On appeal from a grant of summary judgment based upon the ordinary-course defense, the trustee argued that the debt could not have been incurred in the ordinary course of C.W. Mining's coal-mining business because the debt was incurred for a coal-mining system that was a different type than C.W. Mining's existing operation. The BAP observed that "[d]ecisions from the Tenth Circuit Court of Appeals have not discussed the 'incurred' prong of the ordinary course of business defense."[85] It therefore relied upon *Valley Steel*,[86] a bankruptcy court decision, and decisions from the Sixth and Ninth Circuits using similar reasoning.[87] Specifically, the panel quoted the following from *Valley Steel*: "[C]ourts generally are interested in whether or not the debt was incurred in a typical, arms-length commercial transaction that occurred in the marketplace, or whether it occurred as an insider arrangement with a closely-held entity."[88] The panel affirmed because "the bankruptcy

---

[85] *Id*. at 642.

[86] *Id*. (*citing Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728 (Bankr. W.D. Va. 1995)).

[87] *Id*. at 643 (*citing Gosch v. Burns (In re Finn)*, 909 F.2d 903, 907 (6th Cir. 1990) and *Wood v. Stratos Prod. Dev., Inc. (In re Ahaza Sys., Inc.)*, 482 F.3d 1118, 1126 (9th Cir. 2007)).

[88] *Id*. (*quoting In re Valley Steel*, 182 B.R. at 735).

34

court properly focused on the creation of the debt at issue, asking whether the transaction was a typical arms-length creation of debt in the open market," and the trustee had not challenged any of the facts that demonstrated it was such a transaction.[89]

Subsequent to the filing of briefs in this proceeding, the Tenth Circuit affirmed the BAP decision in *C.W. Mining*.[90]  With respect to the incurrence of the debt, the Circuit held that "the requirement must be read in light of the 'general policy of the preference section to discourage unusual action by either the debtor or [its] creditors during the debtor's slide into bankruptcy.'"[91]  Under this rationale, the exception may not be available "[w]hen the new debt is very large and unprecedented," since "it may represent an expenditure (an incurrence of debt) that is being undertaken only because the debtor is sliding into bankruptcy."[92]  The Circuit rejected the requirement of some courts for "the incurrence of the debt and the payment to be in the ordinary course of business *between* the debtor and the transferee" because under that standard "any first-time transaction (like the one between C.W. Mining and SMC) would seem to be *per se* ineligible for the exception because there is no prior course of dealing to examine."[93]  But it agreed with the circuit courts "who have held that a first-time transaction can qualify for the

---

[89] *Id*.

[90] *In re C.W. Mining*, ___ F.3d ___, 2015 WL 4717709.

[91] *Id*. at *4 (*quoting Union Bank v. Wolas*, 502 U.S. 151, 160 (1991)).

[92] *Id*. at *4.

[93] *Id*. at *3.

35

exception,"[94] if the debt is "ordinary in relation to this debtor's and this creditor's past practices when dealing with other, similarly situated parties."[95]

CJD urges the Court to follow the subjective test for incurring debt for purposes of § 547(c)(2)(A). Its primary authority is *Liberty Livestock*. The Trustee urges the Court to adopt the objective test of the BAP's *C.W. Mining* decision and other cases. Each party makes extensive argument about the alleged deficiencies of the other's authorities.

CJD's basic argument is that the ordinary-course-debt requirement is satisfied because Brooke Corp and CJD ordinarily engaged in the financial transactions at issue. The statistical analysis of an expert is presented, comparing transactions before and during the one-year preference period and concluding that there was minimal change in the frequency and timing of the Cash Management Transfers. CJD argues that the BAP's *C.W. Mining* decision did not hold that for the ordinary-course-of-business defense to apply, "the transactions at issue must be typical, arms-length creations of debt in the open market."[96] It then examines the authorities cited by the BAP and argues that the focus in those cases was subjective and concludes that *C.W. Mining* "merely muddies the water on this first prong of the ordinary course of business defense — it provides no definitive guidance."[97] CJD next argues that the subjective view is the majority position, citing

---

[94] *Id*. at *4.

[95] *Id*. at *4 (*quoting In re Ahaza Sys., Inc.*, 482 F.3d at 1126).

[96] Doc. 120 at 18.

[97] Doc. 120 at 19.

36

*Tennessee Valley Steel*,[98] and that *Valley Steel*,[99] relied on by the BAP's *C.W. Mining* decision, is actually the source of the confusion concerning the objective versus subjective standard. In other words, CJD contends there is plenty of fodder for attacking the BAP's adoption of the objective test in *C.W. Mining*.

The Trustee argues that Brooke Corp's debt to CJD was not incurred in the ordinary course. Neither Brooke Corp nor CJD was engaged in the business of making short-term loans. CJD was a professional wholesale general insurance agency. It was not in the business of making short-term loans. The repayments were transfers to an insider for very atypical loans. The Trustee relies upon the BAP's *C.W. Mining* decision for the proposition that the test is whether "'the transaction was a typical arms-length creation of debt in the open market.'"[100] He also relies upon *Valley Steel*[101] and numerous other decisions that adopt the rationale that "repayment of loans to insiders or closely affiliated parties did not satisfy the first element of the ordinary course defense."[102]

The Court finds merit in both the subjective and objective tests, and believes that the correct result was reached in the foregoing cases, despite their stated disagreement as to the applicable test. There is no apparent reason why courts should adopt either the

---

[98] *In re Tenn. Valley Steel Corp.*, 203 B.R. at 953-54.

[99] *In re Valley Steel Corp.*, 182 B.R. at 728.

[100] Doc. 118 at 28 (*quoting In re C.W. Mining*, 500 B.R. at 643).

[101] *In re Valley Steel Corp.*, 182 B.R. at 735.

[102] Doc. 118 at 29.

37

subjective or objective alternatives as controlling for all circumstances. The Bankruptcy Code requirement that the transfer be "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee" does not specify that the test must be either subjective or objective. This is in contrast to the requirement of § 547(c)(2) that the transfer satisfy one of two tests, the subjective test stated in § 547(c)(2)(A) or the objective test stated in § 547(c)(2)(B). The Tenth Circuit's directive that the incurrence of the debt requirement "be read in light of the 'general policy of the preference section to discourage unusual action by either the debtor or [its] creditors during the debtor's slide into bankruptcy'"[103] does not require a choice between the two alternatives. An objective test was applied by the Tenth Circuit in *C.W. Mining* because there was no history of transactions between the debtor and its creditor. *Ahaza Systems*, the Ninth Circuit opinion relied upon by the Tenth Circuit when adopting an objective test for first-time transactions, states, "[t]o determine what is 'ordinary' among parties who have interacted repeatedly, we inquire into the pattern of interactions between the *actual* creditor and the *actual* debtor in question, not about what transactions would have been 'ordinary' for either party with *other* debtors or creditors."[104] With respect to the requirement of § 547(c)(2) that the debt be incurred in the ordinary course of business or financial affairs of the debtor and the transferee, in some cases, the circumstances will

---

[103] *In re C.W. Mining*, ___ F.3d ___, 2015 WL 4717709 at *4 (*quoting Union Bank v. Wolas*, 502 U.S. at 160).

[104] *In re Ahaza Sys., Inc.*, 482 F.3d at 1124.

render the subjective test predominant, and in others, the objective test will be the most important. By having both tests available, courts can be gatekeepers to assure that the ordinary-course defense applies to promote the purpose of the defense — to discourage unusual action by either the debtor or its creditors during the debtor's slide into bankruptcy.

The Court finds that to properly apply the ordinary-course-of-business-or-financial-affairs defense, it must consider the Cash Management Transfers separately from the other account-to-account transfers which the Trustee seeks to avoid. The debt Brooke Corp satisfied by the Cash Management Transfer made on September 17, 2008, had been incurred the day before, on September 16, 2008, when $1,990,000 of CJD's cash was transferred to Brooke Corp. The debt was created through the use of the Cash Management System in the manner that was customary between the parties. It was subjectively ordinary. The Cash Management System was an aspect of the financial affairs of Brooke Corp and CJD, an indirect subsidiary of Brooke Corp. Other Brooke entities, not only CJD, participated in the system. Although it was not an arm's-length transaction, there is nothing in the record indicating this Cash Management Transfer was unusual. Creditors of Brooke Corp were not harmed — by definition each Cash Management Transfer repaid the exact amount CJD had very recently transferred to Brooke Corp. The debt was sufficiently ordinary to satisfy § 547(c)(2).

However, with respect to the payment of debt by the account-to-account transfers which were not Cash Management Transfers, the Court finds that the ordinary-course

39

defense is not available. The debt satisfied by these account-to-account transfers was that

represented by the Parent Company Payable, which was $2,378,625.38[105] at the start of

the day on September 18, 2008, and was $3,199,393.76 on October 24, 2008. The

uncontroverted facts concerning Brooke Corp's incurring of this debt are sparse to non-

existent. There is no evidence that such transfers were ordinary between the parties. The

overwhelming evidence is that only the Cash Management Transfers were considered to

be within the bounds of the Cash Management System. There is no evidence that the

other account-to-account transfers were objectively ordinary-course transactions. Rather,

it appears that from time to time, Brooke Corp converted funds from CJD's accounts for

purposes other than managing the short-term cash needs of the Brooke entities.

For the foregoing reasons, the Court concludes that CJD has proven that the

ordinary-course defense precludes the Trustee from avoiding the Cash Management

Transfer of $1,990,000 Brooke Corp made to CJD on September 17, 2008.

### D.  WHEN THE SEPTEMBER 17, 2008 TRANSFER FROM BROOKE CORP TO CJD OF $1,990,000 IS REMOVED FROM THE PREFERENCE ANALYSIS, CJD HAS NO LIABILITY TO BROOKE CORP'S BANKRUPTCY ESTATE.

As analyzed above, the Court concludes that CJD has a valid defense to the

Trustee's claim to recover Brooke Corp's transfer to CJD of $1,990,000 on September 17,

2008. As shown on Attachment A, this leaves transfers of $55,000, $1,527.40, $1,000,

and $600 as avoidable preferential transfers from Brooke Corp to CJD for the period from

_____

[105] *See* Doc. 117 at 24.

Case 11-06236   Doc# 133   Filed 09/08/15   Page 40 of 44

September 17, 2008, through October 28, 2008, the date Brooke Corp filed for bankruptcy relief. During this same period, fourteen transfers of CJD's funds totaling far more than the preferential transfers were made to Brooke Corp. As shown on Attachment B,[106] when the subsequent-new-value defense under § 547(c)(4) is applied to the transfers after September 17, 2008 (with the $1,990,000 Cash Management Transfer removed from the calculation), CJD has no preference liability to Brooke Corp's bankruptcy estate.[107]

**CONCLUSION.**

The Court finds that the controlling facts are uncontroverted and that, as a matter of law, CJD is entitled to judgment in its favor. Although the Court finds that there was a debtor-creditor relationship between Brooke Corp and CJD during the 90 days before the filing of Brooke Corp's bankruptcy petition, only four transfers between September 17, 2008, and October 24, 2008 are preferential transfers. With respect to the September 17, 2008 transfer of $1,990,000.00, CJD has sustained its burden of proof for both the § 547(c)(1) contemporaneous-exchange-for-new-value defense and the § 547(c)(2) ordinary-course-of-business-or-financial-affairs defense. With respect to the other three preferential transfers, the subsequent-new-value defense under § 547(c)(4) protects CJD from any liability on the Trustee's claims to avoid those transfers. Since the Trustee may not avoid any transfers, his claim for prejudgment interest is moot.

---

[106] This attachment adopts the accounting method urged by CJD, which applied the subsequent-new-value defense under § 547(c)(4) to the transfers after September 17, 2008, with the $1,990,000 September 17, 2008 Cash Management Transfer removed from consideration. Doc. 115-14 at 27.

[107] *Id.*

41

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure, which makes Rule 52(a) of the Federal Rules of Civil Procedure applicable to this proceeding. A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 7058, which makes Federal Rule of Civil Procedure 58 applicable to this proceeding.

**IT IS SO ORDERED.**

**ATTACHMENT A**
**TRUSTEE'S PREFERENCE CLAIM MINUS SUBSEQUENT NEW VALUE**[108]

| Date | CJD deposit (transfer from Brooke Corp) | Brooke Corp deposit (transfer from CJD) | Net Preference Running Balance |
|---|---|---|---|
| 9/16/08 (before $1,990,000 transfer) | | | $3,316,989.10 |
| 09/16/08 | | $1,990,000.00 | $1,326,989.10 |
| 09/17/08 | | $1,380,000.00 | $0.00 |
| 09/17/08 | $1,990,000.00 | | $1,990,000.00 |
| 09/18/08 | | $315,000.00 | $1,675,000.00 |
| 09/18/08 | | $113,000.00 | $1,562,000.00 |
| 09/18/08 | $55,000.00 | | $1,617,000.00 |
| 09/18/08 | | $53,137.77 | $1,563,862.23 |
| 09/18/08 | $1,527.40 | | $1,565,389.83 |
| 09/18/08 | | $3,942.24 | $1,561,447.39 |
| 09/22/08 | | $98,000.00 | $1,463,447.39 |
| 09/26/08 | | $185,000.00 | $1,278,447.39 |
| 09/26/08 | $1,000.00 | | $1,279,447.39 |
| 09/29/08 | $600.00 | | $1,280,047.39 |
| 10/03/08 | | $34,938.39 | $1,245,109.00 |
| 10/03/08 | | $16,573.20 | $1,228,535.80 |
| 10/03/08 | | $885.66 | $1,227,650.14 |
| 10/16/08 | | $35,405.71 | $1,192,244.43 |
| 10/17/08 | | $17,713.05 | $1,174,531.38 |
| 10/22/08 | | $2,601.27 | $1,171,930.11 |
| 10/22/08 | | $2,605.24 | $1,169,324.87 |
| 10/24/08 | | $93.25 | $1,169,231.62 |

---

[108] Doc. 117 at 25; Doc. 115-13 at 28.

43

**ATTACHMENT B**
**PREFERENCE ANALYSIS AFTER**
**REMOVAL OF CASH MANAGEMENT TRANSFERS**[109]

| Date | CJD deposit (transfer from Brooke Corp) | Brooke Corp deposit (transfer from CJD) | Net Preference Running Balance |
|---|---|---|---|
| 09/16/08 (before $1,990,000 transfer) | | | $331,630.00 |
| 09/16/08 | | ~~$1,990,000.00~~ | $331,630.00 |
| 09/17/08 | | $1,380,000.00 | $0.00 |
| 09/17/08 | ~~$1,990,000.00~~ | | |
| 09/18/08 | | $315,000.00 | $0.00 |
| 09/18/08 | | $113,000.00 | $0.00 |
| 09/18/08 | $55,000.00 | | $55,000.00 |
| 09/18/08 | | $53,137.77 | $1,862.23 |
| 09/18/08 | $1,527.40 | | $3,389.63 |
| 09/18/08 | | $3,942.24 | $0.00 |
| 09/22/08 | | $98,000.00 | $0.00 |
| 09/26/08 | | $185,000.00 | $0.00 |
| 09/26/08 | $1,000.00 | | $1,000.00 |
| 09/29/08 | $600.00 | | $1,600.00 |
| 10/03/08 | | $34,938.39 | $0.00 |
| 10/03/08 | | $16,573.20 | $0.00 |
| 10/03/08 | | $885.66 | $0.00 |
| 10/16/08 | | $35,405.71 | $0.00 |
| 10/17/08 | | $17,713.05 | $0.00 |
| 10/22/08 | | $2,601.27 | $0.00 |
| 10/22/08 | | $2,605.24 | $0.00 |
| 10/24/08 | | $93.25 | $0.00 |

# # #

---

[109] *See* Doc. 115-14 at 27.